HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NIRMAL SINGH,

    Plaintiff,

  v.

MARILYN P. WILES[1], et al.,

    Defendants.

CASE NO. C07-1151RAJ

ORDER

## I. INTRODUCTION

This matter comes before the court on the parties' cross-motions for summary judgment. Dkt. ## 66, 67. Defendants requested oral argument; plaintiff did not. As the court's review is limited to the administrative record, the court finds oral argument unnecessary. For the reasons stated below, the court GRANTS Plaintiff's motion, DENIES Defendant's motion, and remands this action to United States Citizenship and Immigration Services ("USCIS") for a new adjudication of Plaintiff's application for adjustment of status. The court DISMISSES this action, and the clerk shall enter judgment for Plaintiff.

---

[1] The court directs the clerk to substitute Marilyn Wiles, director of the Nebraska Service Center of United States Citizenship and Immigration Services, for Gerald Heinauer, her predecessor. Fed. R. Civ. P. 25(d).

ORDER – 1

## II.  BACKGROUND

After much administrative wrangling, this dispute now turns on an understanding of the Sikh fundamentalist movement in northwest India from the 1970s to the 1990s and whether Damdami Taksal, a Sikh religious institution, can be branded a "terrorist organization" within the meaning of Section 212 of the Immigration and Nationality Act ("INA").  8 U.S.C. § 1182(a)(3)(B)(vi).

Plaintiff Nirmal Singh is a native of India and a Sikh holy man who has resided lawfully in the United States since at least 1999, when USCIS's predecessor granted him asylum.  In February 2001, he filed an application to adjust his immigration status to "lawful permanent resident."  More than eight years passed between Mr. Singh's application and the USCIS's final disposition of his application.  The eight-year delay has been the subject of this court's prior orders, and the court declines to repeat that discussion here.  To summarize, USCIS initially delayed adjudication of Mr. Singh's application because of a quota limiting the number of asylees who could adjust their status, delayed it after the quota for other reasons, then denied it, then vacated the denial while the Department of Homeland Security ("DHS") considered policy changes that might benefit Mr. Singh, then denied it again when DHS declined to adopt such changes.

The pending motions concern USCIS's most recent denial of Mr. Singh's application, memorialized in an October 2, 2009 letter ("Denial Letter").  Dkt. # 53.  USCIS declared Mr. Singh ineligible for adjustment of status because he had provided aid to a terrorist organization while he resided in India.  Denial Ltr. at 3.  Specifically, the Denial Letter cited Mr. Singh's admission that "in 1984 [he] had allowed members of Damdami Taksal to spend the night at [his] temple and that sometimes [members of Damdami Taksal] came there to hide from police."  Denial Ltr. at 2.  A portion of the Denial Letter reviews various public reports and articles that USCIS contends support its conclusion that Damdami Taksal was a terrorist organization when Mr. Singh aided its members.

ORDER – 2

Mr. Singh was aware that USCIS took the position that Damdami Taksal was a terrorist organization. It had stated as much in an October 25, 2007 letter notifying him of its intent to deny his application. Administrative Record ("AR")[2] (Dkt. # 32) at 22-24. In response to that letter, Mr. Singh submitted a statement from Dr. Cynthia Mahmood, an anthropology professor from the University of Notre Dame. AR (Dkt. # 32) at 60-65. Dr. Mahmood has conducted research and written extensively about Sikhism, Sikh culture, and militant or fundamentalist Sikh movements.

Dr. Mahmood explains that Damdami Taksal is a Sikh educational institution, something akin to a seminary, although Sikhism has no priesthood. At any given time, some number of Sikhs are in study at Damdami Taksal.

In the late 1970s, Jarnail Singh Bhindranwale became the leader of Damdami Taksal. He is widely associated with the "Khalistan" movement, which sought to establish an independent Sikh republic. As the movement grew, clashes between Sikhs and the Indian government led to the death of some Sikhs. In April 1984, Bhindranwale came to Mr. Singh's village to baptize 200 Sikh boys. At that time, one of Mr. Singh's assistants collected money from villagers to give the Bhindranwale and his supporters to help the families of Sikhs who had been killed. The record suggests that Mr. Singh was aware that Bhindranwale and his supporters purchased arms, but that he was told that the money his assistant collected would be used solely to support families in need.

Not long after his visit to Mr. Singh's village, Bhindranwale and a group of armed supporters installed themselves in the Golden Temple in Amritsar, the holiest shrine of the Sikh religion. Indian military forces clashed with him and his supporters. In thirty-six hours of fighting, hundreds of Sikhs and a smaller number of soldiers were killed.

---

[2] The administrative record in this case is fragmented, as USCIS submitted it piecemeal as the adjudication of Mr. Singh's application evolved over the past three years. When citing a portion of the record, the court will note the docket number at which that portion appears. In addition, the court notes that the last fragment of the administrative record (Dkt. # 68) is numbered in reverse order. Accordingly, when the court cites multiple pages from that portion of the record, the citation will be in reverse order as well.

ORDER – 3

Bhindranwale was among the dead. There were many episodes of violence in Punjab in the wake of the Golden Temple incident. Mr. Singh led a group of Sikhs from his village to Amritsar, but Indian authorities arrested Mr. Singh en route. The police held him until October 16, 1984. When he returned to his village and resumed preaching, he allowed unarmed Damdami Taksal members to sleep in his temple. Some of them admitted that they were hiding from the police. Between 1984 and 1996, Indian authorities often searched Mr. Singh's temple. They never arrested anyone at the temple until 1996, when they arrested Mr. Singh and his assistant. After bribing his way out of jail, Mr. Singh fled to the United States in 1997. He successfully sought asylum on the basis of religious persecution.

There is little controversy about the facts that the court cited above. They are culled from the reports on which USCIS has relied, Dr. Mahmood's statement, and documents from Mr. Singh's asylum application. The court recites them here to provide context for its later analysis.

The Denial Letter gave only one reason for rejecting Mr. Singh's application for adjustment of status: Mr. Singh gave aid to a terrorist organization when he allowed members of Damdami Taksal to sleep in his temple and hide from police. The court's task is to determine whether that determination can stand.

### III.  ANALYSIS

Mr. Singh relies on the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706, as the basis for challenging USCIS's denial of his application. The APA does not permit plenary review of an agency decision. With certain exceptions not applicable here, the court can set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard is deferential to the agency. It is not enough that the court would have come to a different conclusion than the agency. *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841 (9th Cir. 2003). Instead, the court reviews the agency's decision to determine if

ORDER – 4

1    it "considered the relevant factors and articulated a rational connection between the facts
2    found and the choice made." *Id.* The court's review is limited to the administrative
3    record. *Id.* ("[T]he basis for the agency's decision must come from the record.").

4    The parties have chosen to rely on summary judgment motions. On a motion for
5    summary judgment, the court must draw all inferences from the admissible evidence in
6    the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d
7    1130, 1134 (9th Cir. 2000). Summary judgment is appropriate where there is no genuine
8    issue of material fact and the moving party is entitled to a judgment as a matter of law.
9    Fed. R. Civ. P. 56(c). The moving party must initially show the absence of a genuine
10   issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The opposing
11   party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v.*
12   *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present
13   probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident &*
14   *Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). The court defers to neither party in
15   resolving purely legal questions. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942
16   (9th Cir. 1999). Because the court typically makes no finding of fact in determining if an
17   agency's decision is arbitrary or capricious, APA disputes are typically amenable to
18   resolution by summary judgment.

19   In the court's view, judgment as a matter of law is appropriate because no one
20   reviewing the administrative record could find a rational relation between the facts the
21   record reveals and USCIS's conclusion that Damdami Taksal was a terrorist organization.
22   An explanation of that conclusion requires the court to begin with the statutory labyrinth
23   through which the INA excludes aliens who aid terrorist organizations.

24   **A.     Overview of Terrorism-Related Grounds for Inadmissibility**

25   Subsection 1182(a) describes numerous grounds for deeming an alien inadmissible
26   to the United States, including "[s]ecurity and related grounds" for inadmissibility at
27   § 1182(a)(3). Among other things, § 1182(a)(3) makes inadmissible any alien who "has
28   ORDER – 5

engaged in terrorist activity." § 1182(a)(3)(B)(i)(I).  The range of "terrorist activity" is quite broad, and includes the conduct for which USCIS deemed Mr. Singh inadmissible: "commit[ing] an act that the actor knows, or reasonably should know, affords material support" to a terrorist organization.  § 1182(a)(3)(B)(iv) & § 1182(a)(3)(B)(iv)(VI).  "Terrorist organization[s]" fall into two categories:  those officially designated as terrorist organizations (§ 1182(a)(3)(B)(vi)(I)-(II)) and undesignated terrorist organizations (§ 1182(a)(3)(B)(vi)(III)).  When USCIS denied Mr. Singh's application, it concluded that Damdami Taksal was an "undesignated terrorist organization" to whom Mr. Singh provided "material support in 1984."  Denial Ltr. at 3.

Mr. Singh admits that he provided a place to sleep for Damdami Taksal members, and there is no dispute that this qualifies as "material support" within the meaning of § 1182(a)(3)(B)(iv)(VI).  It is important to note, however, that permitting Damdami Taksal members to sleep in his temple is the sole type of "material support" to which USCIS pointed.  The record reflects that persons associated with Mr. Singh collected money for either Bhindranwale or his supporters early in 1984.  AR (Dkt. # 32) at 25, 34.  USCIS has never contended that this constitutes providing material support to a terrorist organization, and there is no evidence that the supporters with Bhindranwale at the time of the donation were members of Damdami Taksal.[3]

The critical question, therefore, is whether the record supports USCIS's determination that Damdami Taksal was an undesignated terrorist organization.  An undesignated terrorist organization is a "group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv)."  § 1182(a)(3)(B)(vi)(III).  The

---

[3] Although Mr. Singh has not pressed the issue, the court notes that awareness that Bhindranwale and his supporters purchased arms is not the same as awareness that Damdami Taksal members purchased arms or otherwise engaged in terrorist activity.  Material support to an undesignated terrorist organization is a ground for inadmissibility, but an alien has a defense if he can show by "clear and convincing evidence that the actor did not know, and should not have known, that the organization was a terrorist organization."  § 1182(a)(3)(B)(iv)(VI)(dd).

ORDER – 6

activities described in the designated subclauses are exceedingly broad in scope. They include committing or inciting terrorist activity, preparing or planning terrorist activity, gathering information on targets for terrorism, soliciting funds for terrorist activities or terrorist organizations, soliciting people to engage in terrorism or join a terrorist organization, and providing material support for terrorist activity, terrorists, or terrorist organizations. § 1182(a)(3)(B)(iv)(I)-(VI). The statute also defines "terrorist activity" broadly, to include not only traditional acts of terrorism, but any use of a weapon or other dangerous instrument with the intent to endanger people or property. § 1182(a)(3)(B)(iii)(I)-(VI). As other courts have observed, it appears that "Congress intentionally drafted the terrorist bars to relief very broadly . . . ." *In re S.K.*, 23 I. & N. Dec. 936, 941 (B.I.A. 2006); *Khan v. Holder*, 584 F.3d 773, 777 (9th Cir. 2009).

## B. Review of the Administrative Record

The court now reviews the administrative record, beginning with the sources on which USCIS relied and then turning to the sources that Mr. Singh submitted.

### 1. Sources That USCIS Placed in the Administrative Record

The Denial Letter relies on snippets of publicly available reports. Several were from Canadian sources collected at the website for the United Nations High Commission for Refugees ("UNHCR"). USCIS also relied on another report from Denmark's immigration service, an article from the website at www.satp.org (the South Asian Terrorism Portal), and a Time Magazine article. USCIS contends that these sources support its view that Damdami Taksal was a terrorist organization.

USCIS first cited two reports from the Immigration and Refugee Board of Canada that described Damdami Taksal during the early to mid-1980s as a "militant Sikh religious seminary group." Denial Ltr. at 2 (citing AR (Dkt. # 68) at 76). Although one of the reports uses that characterization, the use of the term "militant" without more is no basis for concluding that Damdami Taksal was a terrorist organization.

ORDER – 7

The first report, which is three paragraphs long, states that in 1988 Damdami Taksal leaders "expressed their concern over renewed killings." AR (Dkt. # 68) at 78. It does not state or imply that Damdami Taksal members were responsible for the killings. Similarly, a statement that a January 1990 "assassination of a AISSF leader was apparently linked to power struggle with the Damdami Taksal," does not give any basis for determining that Damdami Taksal was responsible for the assassination. *Id.* Indeed, the only statement the first report makes about the actions of Damdami Taksal is that in 1988 it "served as a mediator between Sikh gunmen in Amritsar and the government." *Id.* The second report scarcely mentions Damdami Taksal, stating only that its members "formed an advisory panel to look after the religious and political affairs of the Sikhs." AR (Dkt. # 68) at 76 (internal quotation omitted).

The Denial Letter next cites a report from the Danish Immigration Service for the proposition that Bhindranwale was a "charismatic Sikh religious leader, who preached fervent fundamentalism and the armed fight for national freedom." Denial Ltr. at 2. The report states that Bhindranwale and "armed supporters" occupied the Golden Temple in Amritsar in 1984, leading to the "attack" by the Indian military that killed Bhindranwale and "hundreds of his supporters." AR (Dkt. # 68) at 68-67. The description of the conflict makes no mention of Damdami Taksal. Only later in the report is Damdami Taksal named as a "religious group which trained Sikh priests" that "militant Sikh leader Bhindranwale" once led. *Id.* at 56. The report noted that some militant Sikh groups recruited from Damdami Taksal. *Id.* The report does not suggest that Damdami Taksal was involved in violence. Indeed, the report names dozens of militant Sikh groups that operated in India from the 1970s through 2000, never suggesting that Damdami Taksal was one of them. The report does, however, explain why Damdami Taksal members might have hid in Mr. Singh's temple. Following the assassination of Prime Minister Indira Ghandi in October 1984, "a massacre of Sikhs in and around Delhi began which left thousands dead and thousands more injured and homeless . . . ." *Id.* at 67. The report

ORDER – 8

describes the "police's abuse of power, serious human rights violations, arbitrary execution of suspects and the disappearance of young Sikh men" in the period from 1984 to 1992.  *Id.* at 67.  The report also describes police monitoring of Sikh temples.  *Id.* at 33 (relating claim by source that "since 1992 those administering Sikh temples had been obliged to provide the police with a list of guests staying there overnight").

The Denial Letter also relies on an assessment from the South Asian Terrorism Portal for a description of a 1978 incident in which "[s]ixteen followers of the Damdami Taksal and the Akhand Kirtani Jatha were killed."  Denial Ltr. at 2; AR (Dkt. # 68) at 19.  Nothing in the assessment suggests that any members of Damdami Taksal acted violently or were armed.  The assessment viewed the incident as the "beginning of terrorist violence in Punjab," and described Bhindranwale's installation in the Golden Temple in 1984.  AR (Dkt. # 68) at 19.  The "parallel administration" he set up within the temple stored weapons, issued *diktats*, threatened police and others, and tortured and killed people inside the temple.  *Id.*  The report does not suggest, however, that Damdami Taksal members were installed with Bhindranwale in the temple.  Like the Danish report, the assessment describes a terrorist movement and government counter-movement in the years following Bhindranwale's death at the temple.  *Id.* at 19-18.  The assessment includes a list of terrorist groups operating in the region, a list that does not include Damdami Taksal.  *Id.* at 18.

The Denial Letter's next citation is to another report from the Immigration and Refugee Board of Canada available on the UNHCR website.  Denial Ltr. at 2.  The report explains that in "January 1986, a group of 20,000 Sikh members of the Damdami Taksal and the AISSF entered the Golden Temple in Amritsar, took control . . ., and announced the establishment of an advisory panel to look after the religious and political affairs of the Sikhs."  AR (Dkt. # 68) at 7.  There is no indication that anyone used violence in taking control of the temple.  In April, the "150 member advisory panel declared a separate Sikh state of Khalistan."  *Id.*  That declaration led to an escalation of

ORDER – 9

"[s]ecessionist-related violence," but there is no suggestion that the advisory panel advocated violence.

Finally, the Denial Letter points to a Time Magazine article published just after the June 1984 raid on the Golden Temple in which Bhindranwale and others were killed. Denial Ltr. at 3. The article notes that Bhindranwale had "provoked the violence," and had stated in advance of the raid that "We will give them battle. If die we must, then we will take many of them with us." AR (Dkt. # 68) at 4. Bhindranwale and his supporters resisted the raiders with rockets and machine guns. *Id.* at 3. Like other accounts in the record, the article describes the death of many Sikhs in the raid, and the violence throughout Punjab after the raid. The article does not mention Damdami Taksal.

### 2.      Sources That Mr. Singh Placed in the Administrative Record

The Denial Letter makes no mention of the material Mr. Singh submitted in response to USCIS's notice of its intent to deny his application. Nonetheless, the court must consider the complete record when determining whether it supports the conclusions USCIS reached.

Mr. Singh's primary contribution to the record was Dr. Mahmood's statement.[4] She provides brief background on Sikhism and Damdami Taksal, including the explanation that Damdami Taksal is "not an organization at all, but an institution, one of the most venerable educational institutions in Sikhism." AR (Dkt. # 32) at 63. She then considers the sources USCIS cited in its notice of intent to deny, which differ somewhat from the sources it later cited in the Denial Letter. She describes the 1978 murder of Damdami Taksal members, and explains what USCIS's sources do not address:

---

[4] The copy of Dr. Mahmood's statement in the Administrative Record is unsigned. Mr. Singh has provided unrebutted evidence that he submitted a signed statement in advance of USCIS's adjudication. Dkt. # 71, Ex. 1. USCIS suggests both that Dr. Mahmood's statement "does not deserve the weight of a sworn affidavit" (Dkt. # 70 at 19 n.17) and that it "focus[ed] on the substance of Dr. Mahmood's statement rather than the fact that the document contained in the record was unsigned." Dkt. # 73 at 8 n.7. The court finds that Mr. Singh submitted a signed statement from Dr. Mahmood, and that even if he had not, the lack of a signature is no basis to afford the document less weight.

ORDER – 10

Damdami Taksal members had assembled peacefully, and were murdered by another group. *Id.* at 63-64 ("This is a case of someone using a source without full awareness of its credibility, and not checking the further historical context."). She questions USCIS's efforts to paint Bhindranwale as a terrorist, but she does not deny that he and his supporters were armed and engaged in violence. *Id.* at 64. Finally, she addresses Damdami Taksal's role in taking control of the Golden Temple in 1986. She explains that most of the 20,000 Sikhs involved were members of the AISSF, a much larger organization. *Id.* at 65. She contends that AISSF did not advocate violence, although many Sikh groups operating in the region did. *Id.*

Mr. Singh also submitted a 1999 report from the British Home Office. The report states that Bhindranwale "preached strict fundamentalism and an armed struggle for national liberation." AR (Dkt. # 32) at 105. He and his unnamed followers "established a terrorist stronghold" at the Golden Temple in 1984. Damdami Taksal is nowhere mentioned in the discussion of Bhindranwale and his violent activity. The report lists seven "major" Sikh militant groups, and Damdami Taksal is not among them. *Id.* at 107. The only discussion of Damdami Taksal comes in the report's appendix of "other organizations." *Id.* at 132-33. It describes the group as "one of the most distinguished Sikh seminaries in India." *Id.* at 133. It is the only source in the record to make a direct statement regarding Damdami Taksal and violence:

> As far as can be established, Dam Dami Taksal has never itself advocated an armed struggle for an independent Sikh state. It has almost certainly never had any direct link with terrorist organizations, though its orthodox teaching may have inspired those who took up the gun. Nowadays [as of 1999] it is a purely religious institution.

*Id.* at 133.

Mr. Singh also submitted a journal article examining Sikh fundamentalism. It advocated the need to "distinguish members of Damdami Taksal from the much broader group of those who were fighting for Khalistan." AR (Dkt. # 32) at 159.

ORDER – 11

**C.   The Record Does Not Support the Conclusion that Damdami Taksal Was a Terrorist Organization.**

From this record, the court now considers USCIS's conclusion that Damdami Taksal was an undesignated terrorist organization. That conclusion is correct if Damdami Taksal was, at the relevant time, a "group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv)." § 1182(a)(3)(B)(vi)(III).

So far as the record reveals, Mr. Singh did not provide support to Damdami Taksal until at least October 1984. By then, Bhindranwale, the sole member of Damdami Taksal who the record identifies as having committed terrorist acts, was dead. USCIS appears to reason that Bhindranwale engaged in terrorist activity, and thus the Damdami Taksal organization that he led is a terrorist organization. The record is devoid, however, of any indication that any Damdami Taksal member except Bhindranwale engaged in terrorist activities.[5] USCIS's arguments to the contrary are not persuasive. Its contention, for example, that the murder of Damdami Taksal members in 1978 somehow shows that those members were engaging in terrorist activity is unsupportable. There is no evidence that the murder victims were armed or otherwise engaging in terrorist activity. USCIS has documented that Bhindranwale and unidentified "supporters" engaged in terrorist activity at times from 1978 to 1984. What it has not shown is that Bhindranwale's terrorist supporters were members of Damdami Taksal.[6]

The record reflects that members of Damdami Taksal and others took control of the Golden Temple in 1986. This is one of the few instances in the record that describe

---

[5] Mr. Singh questions whether the activities of a group's leader can be attributed to the group. That question is an important one, and one to which USCIS has devoted little analysis. The court need not answer the question in this case, because at a minimum, USCIS needs evidence of one more member of the group engaging in terrorist activity. USCIS lacks that evidence.

[6] In its briefing before the court, USCIS repeatedly quotes statements in the record that make no reference to Damdami Taksal at all, while asserting without explanation that the statements are about Damdami Taksal. *See*, *e.g.*, Dkt. # 66 at 17.

ORDER – 12

activity by Damdami Taksal, rather than Bhindranwale and unnamed "supporters." There is no evidence in the record, however, that Damdami Taksal members (or anyone else) took the temple by violence or by threats of violence or by any other means that would make their actions terrorism within the meaning of the INA. While they advocated for Khalistan, there is no evidence that they advocated violence.

In the Denial Letter, USCIS did not explain precisely how Damdami Taksal's activities were terrorist activity. An examination of the statutory definition of "[e]ngage in terrorist activity" yields no better answer. Most acts that constitute "[e]ngag[ing] in terrorist activity" depend on separately-defined "terrorist activity." The record does not permit the rational conclusion that Damdami Taksal members committed acts that the INA defines as "terrorist activity." They did not hijack a vehicle, seize or detain people to compel government action, attack an "internationally protected person," or assassinate someone. § 1182(a)(3)(B)(iii)(I)-(IV). There is no evidence that Damdami Taksal members other than Bhindranwale carried weapons, much less that they used them "with intent to endanger . . . the safety of one or more individuals or to cause substantial damage." § 1182(a)(3)(B)(iii)(V). There is also no evidence that they threatened, attempted, or conspired to commit any of these terrorist activities. § 1182(a)(3)(B)(iii)(VI).

The record also provides no support for the conclusion that Damdami Taksal members other than Bhindranwale "[e]ngage[d] in terrorist activity," which is a different set of acts that those that constitute "terrorist activity." There is no evidence that members of Damdami Taksal committed or incited a terrorist activity,[7] prepared or planned a terrorist activity, or gathered information on potential targets of terrorist activity. § 1182(a)(3)(B)(iv)(I)-(III). There is no evidence that members solicited

---

[7] USCIS often points to vague statements in the record about Bhindranwale's violent rhetoric and vague statements that violence occurred, and then assumes that the violence occurred because of Bhindranwale's rhetoric. Nothing in the record that shows that anyone's rhetoric incited violence.

ORDER – 13

anyone to join a terrorist organization or engage in terrorist activities. § 1182(a)(3)(B)(iv)(V). There is evidence that Mr. Singh's assistant raised money to give to Bhindranwale and his associates when they came to his village, but USCIS has not relied on this as a basis for claiming that Damdami Taksal members engaged in terrorist activity.[8] § 1182(a)(3)(B)(iv)(IV). Finally, while the record is clear that Mr. Singh provided support for Damdami Taksal members, there is no indication that Damdami Taksal members provided material support for the commission of a terrorist activity. § 1182(a)(3)(B)(iv)(VI).

The court's review of the administrative record and the relevant statutory framework leaves it convinced that there is no rational connection between the facts disclosed in the record and USCIS's determination that Damdami Taksal was a terrorist organization while Mr. Singh permitted its members to sleep at his temple. The record reflects a complex struggle between Sikhs and the Indian government from the 1970s through the 1990s. Many groups advanced Sikh interests in that struggle, using means that ranged from unquestionably peaceful to plainly violent. Damdami Taksal played some role in that struggle, as the record reflects. The record on which USCIS relied does not reflect what that role was, and it provides no basis for the conclusion that the role encompassed conduct that would support its designation as a terrorist organization.

### D.     Additional Concerns About the Administrative Record

In the previous section, the court explained there is no rational connection between the administrative record and USCIS's decision to designate Damdami Taksal as a terrorist organization. That conclusion, by itself, means that the court must vacate the denial of Mr. Singh's application and remand this action to USCIS. The court has other

---

[8] When Mr. Singh was questioned about the donation to Bhindranwale, he explained that he believed that the money would go to the families of murdered Sikhs, and not to buy weapons. USCIS relies on this as evidence that Mr. Singh knew that Bhindranwale and his supporters bought weapons, a proposition that Mr. Singh does not dispute. USCIS seems to assume that Mr. Singh has admitted that the donation went to Damdami Taksal, an assumption that the record does not support.

ORDER – 14

concerns about the administrative record, however, that further undermine USCIS's conclusions.

First, USCIS's decision to include only a few sources in the administrative record raises concerns about its deliberative process. This court is not empowered to act as a fact finder in this case. But, if it were, and if it were inclined to find facts simply by searching the internet for resources describing Damdami Taksal, it would be possible to construct a record that is much more favorable to Mr. Singh's assertion that the group is not a terrorist organization. Indeed, the court could do so merely by disregarding USCIS's sources and focusing on Dr. Mahmood's statement and the report of the British Home Office.[9] That is no way to build a record, of course. It appears, however, that the USCIS used essentially this approach in relying exclusively on its sources without so much as mentioning the materials Mr. Singh submitted. On remand, the USCIS would be well served to better document what sources it considered, and explain, if appropriate, why it declined to rely on other sources.

Second, USCIS's failure to address Dr. Mahmood's declaration raises further doubts about its deliberative process. So far as the record reflects, Dr. Mahmood is the sole person with relevant expertise who considered both Mr. Singh's conduct and Damdami Taksal with an eye toward exploring whether Damdami Taksal was engaged in terrorism. She is not an attorney, and the court does not defer to her legal conclusions. Her factual conclusions, however, have heightened persuasiveness where the record does not contradict them, and no one disputes her expertise.

Third, the court has referred to statements from the sources included in the administrative records as "facts" and "evidence." The court uses those terms loosely.

---

[9] USCIS notes that Mr. Singh bears the burden of proving he is eligible for adjustment. *See* 8 C.F.R. § 103.2(b)(1) ("An applicant or petitioner must establish that he or she is eligible for the requested benefit at the time of filing the application or petition."). Mr. Singh satisfied his burden in this case, submitting evidence from which an adjudicator could conclude that Damdami Taksal was not a terrorist organization. His burden of proof ultimately makes no difference in this case, because even relying solely on the sources USCIS cited, there is no rational connection between those sources and USCIS's conclusions.

ORDER – 15

Some of the information about the Sikh separatist movements is non-controversial, and likely an appropriate subject for administrative notice. *See Castillo-Villagra v. I.N.S.*, 972 F.2d 1017, 1026-27 (9th Cir. 1992) (reviewing administrative notice doctrine). Much of the information critical to USCIS's adjudication of Mr. Singh's application, however, is not an appropriate subject for administrative notice. *Id.* at 1027 ("[T]he administrative desirability of notice as a substitute for evidence cannot be allowed to outweigh fairness to individual litigants."). In *Castillo-Villagra*, USCIS's predecessor was similarly called upon to draw conclusions about a controversial political situation in another country. *Id.* at 1026-27. That court provides an excellent discussion of the line between facts subject to administrative notice and controversies that cannot be dispensed with so easily. Too often in this case, the USCIS has turned controversial assertions from documents whose reliability is unknown into "facts," and then made assumptions from those facts that were fatal to Mr. Singh's application. *Id.* at 1029 ("[T]he agency should not have assumed away petitioners' case.").

**E.   The Record Does Not Permit The Court to Determine Whether USCIS Has Taken Inconsistent Positions on Damdami Taksal's Status as a Terrorist Organization.**

Before concluding, the court addresses Mr. Singh's assertion that other Sikhs who have supported Damdami Taksal have successfully adjusted their immigration status. He made much of this assertion in a prior motion to compel discovery or supplementation of the administrative record. He relied on a declaration from a Seattle immigration attorney who stated that two of his clients had been granted lawful permanent resident status despite their known support of Damdami Taksal. When the court resolved that motion, it directed the parties to meet and confer regarding discovery on this issue among other things. Dkt. # 62 (Apr. 27, 2010 order). They did so, and Mr. Singh declined to seek further discovery or supplementation of the record with regard to that issue. Dkt. # 63 (parties' stipulation regarding administrative record). Nonetheless, Mr. Singh raises the

ORDER – 16

issue again in a footnote to his summary judgment motion.  Pltf.'s Mot. (Dkt. # 67) at 13 n.8.  USCIS offers little response, it merely insists that every case is different.  The court concludes that Mr. Singh's evidence raises troubling questions, but it is not extensive enough to permit the court to answer them.  On the record before the court, it is just as likely that USCIS treated other immigrants differently because the nature of their involvement with Damdami Taksal was different, not because it took inconsistent positions as to Damdami Taksal's status as a terrorist organization.

## IV.  CONCLUSION

For the reasons stated above, the court GRANTS Mr. Singh's motion for summary judgment (Dkt. # 67) and DENIES USCIS's motion (Dkt. # 66).  The court vacates USCIS's October 2009 decision denying Mr. Singh's motion for adjustment of status.  This matter is dismissed, and the court remands this matter to USCIS for a new adjudication of Mr. Singh's application in accordance with this order.  USCIS shall consider Mr. Singh's application anew.  If it adheres to the position that Mr. Singh aided a terrorist organization, it shall provide him with new notice of its intent to deny his application.

The court DISMISSES this action.  The clerk shall enter judgment for Mr. Singh.

DATED this 28th day of September, 2010.

*Richard A. Jones*

The Honorable Richard A. Jones
United States District Judge

ORDER – 17